# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division

FILED
U S DIST COURT
BRUNSWICK DIV

2005 MAY -9 P 5: 04

CLERK

SAMUEL COOPER, ALBERT   :     CIVIL ACTION
FERGUSON, and HERBERT H.
MILLER, JR., on behalf of   :
themselves and all others
similarly situated,   :

     Plaintiffs,   :

        v.   :

PACIFIC LIFE INSURANCE   :
COMPANY and PACIFIC SELECT
DISTRIBUTORS, INC.,   :

     Defendants.   :     NO. CV203-131

## O R D E R

### TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| BACKGROUND | | | 3 |
| DISCUSSION | | | 9 |
| I. | Theories of Liability in the Case | | 9 |
| | A. | Failure to Disclose the Redundancy of Tax-Deferral | 11 |
| | B. | Omissions Related to Suitability Determinations | 14 |
| II. | Class Certification Under Rule 23 | | 26 |
| | A. | Requirements of Rule 23(a) | 29 |
| | | 1. Numerosity | 29 |
| | | 2. Commonality | 30 |
| | | 3. Typicality | 31 |
| | | 4. Adequacy of Representation | 33 |
| | B. | Requirements of Rule 23(b)(3) | 35 |
| | | 1. Common Issues of Law and Fact Predominate | 35 |
| | |     a. Applicable Considerations | 35 |
| | |     b. Analysis | 39 |

AO 72A
(Rev 8/82)

           i.   The Class May Not Be Certified Based on
               an Agency Theory                    39
           ii.  Certification is Appropriate Based on
               Pacific Life's Common Course of Conduct 40
   2.   The Class Device is the Superior Method of
         Adjudication                      54
CONCLUSION                             56

Plaintiffs, Samuel Cooper, Albert Ferguson, and Herbert H. Miller, Jr., filed the above-captioned case against Defendants, Pacific Life Insurance Company and Pacific Life Distributors, Inc. (collectively, "Pacific Life," the "issuer," or the "insurer"), pursuant to §§ 10(b) and 29(b) of the Securities and Exchange Act of 1934, codified at 15 U.S.C. §§ 78j(b) and 78cc(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under § 10(b) of the Act.

The case is before the Court on Plaintiffs' motion to certify the class. Because the requirements of Rule 23 are met, the motion will be **GRANTED**.[1]

---

[1]

    Cooper, Ferguson, and Miller also move to be appointed as class representatives, and move for the appointment of Milberg Weiss Bershad & Schulman LLP ("Milberg Weiss") as class counsel, and Tucker, Everitt, Long, Brewton & Lanier, P A., as liaison class counsel. The motions for the appointment of the class representatives and class counsel will be **GRANTED**.

AO 72A
(Rev 8/82)

**BACKGROUND**

Cooper, Ferguson, and Miller purchased variable annuity contracts from Pacific Life through Carol Hanlon, a registered representative of an independent NASD-registered broker-dealer, Salomon Smith Barney.[2] Plaintiffs purchased the annuities for their Individual Retirement Accounts ("IRAs"), using rollover funds from the retirement plan operated by their former employer, Georgia Pacific Corporation. Each Plaintiff received a prospectus with his annuity.

> A variable annuity is an insurance contract that is subject to regulation under state insurance and [federal] securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in mutual funds: (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

National Association of Securities Dealers ("NASD") Notice to Members 99-35.

The gravamen of Plaintiffs' complaint is that Defendants failed to disclose to them that the tax-deferral aspect of the variable annuity was redundant, and that Defendants failed to

---

[2] This is typical of how class members purchased Pacific Life variable annuities — through thousands of selling agents, usually registered representatives of various broker-dealers throughout the country.

AO 72A
(Rev 8/82)

ensure that proper suitability determinations were made with respect to their purchases.

Cooper, Ferguson, and Miller seek to bring the action on behalf of all persons who purchased an individual variable annuity contract from Pacific Life, between August 19, 1998, and April 30, 2002, to fund a contributory retirement plan or arrangement qualified for favorable tax treatment under the Internal Revenue Code, codified in pertinent part at 26 U.S.C. §§ 401, 403, 408, 408A, or 457 (collectively, "qualified plans").[3]

Qualified plans, like IRAs and 401(k)s, have annual contribution limits. Variable annuities may be attractive to investors who have already made the maximum contribution to their qualified plans, and who want to invest extra income on a tax-deferred basis. Plaintiffs contend that the variable annuity's tax shelter is the sole reason that it exists in the marketplace. However, Defendants argue that the variable annuity's other features, such as lifetime income payments (or "annuitization") and the death benefit, attract qualified plan investors.

---

[3]

Two common types of qualified plans are IRAs and 401(k)s.

4

When a contract owner, or annuitant, purchases a variable annuity, he selects from an array of sub-accounts, which are similar to typical mutual fund offerings, in which to allocate his investment dollars. During the first several years of the contract, if market returns are favorable, the annuitant's account increases in value. This is referred to as the "accumulation phase." Later, the annuitant begins drawing money from the account, during what is known as the "payout phase."

The death benefit is paid to the contract owner's beneficiary if the annuitant dies during the accumulation phase and the underlying investments have decreased in value below the contract owner's initial investment(s). The insurance company pays the beneficiary the difference between the initial premium payments and the account balance, excluding any early withdrawals.[4] Consequently, the annuitant may choose a riskier investment allocation strategy in an attempt to achieve higher returns. Joint SEC/NASD Report on Examination Findings

---

[4]

At least three of the named Plaintiffs, and perhaps all class members, had a variant of the basic death benefit. Merrill Report 6, Pacific Life's Aff. & Dep App., Tab 1. Miller, Ferguson, and David Nelson, each had a death benefit with an annual "step-up" feature. That is, on each anniversary of the plan's inception date, if the account balance had increased, the account's increased balance was "locked-in," and the beneficiary would receive this greater amount, if the death benefit feature became applicable.

5

Regarding Broker-Dealer Sales of Variable Insurance Products 5-6 (June 2004), Micciche Decl., Ex. K.

Annuitization allows an annuitant, when ready to take withdrawals, to choose, instead of a lump sum distribution, a stream of fixed payments guaranteed to last the rest of her life, or for a fixed number of years.[5] The purchase of a tax-deferred variable annuity is not the only way to generate lifetime income payments — a mutual fund investor within an IRA could purchase an immediate annuity contract when she is ready to start receiving income. Rather, in terms of the annuitization feature, the advantage of the variable annuity is that it provides convenience, as the consumer need not go out into the marketplace at a later date and find a provider for this service.

According to the media reports submitted by Pacific Life, only an estimated one to three percent of variable annuity holders choose to take their distributions in lifetime income payments. Deborah Lohse & Bridget O'Brian, Lawyers Seek Class Action Against Insurers Over Annuities, Wall St. J., Nov. 9, 1999, at C15; Ron Panko, Can Annuities Pass Muster?, Best's

---

[5]
The stream of payments may also be variable, perhaps increasing in later years to account for inflation

AO 72A
(Rev 8/82)

Rev. 103, 108 (July 2000), Pacific Life's Statute of Limitations App. (Part 2 of 2) Tabs 67 & 94, respectively.

In internal valuations, Pacific Life placed no economic value on this feature of its product. Indeed, according to Pacific Life Vice President and chief actuary, Jeff Jolley, chances are that the insurer would stand to gain if more customers chose the annuitization feature over a lump sum distribution. Jolley Dep. 19, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 9.

Plaintiffs aver that Defendants were motivated by pecuniary gain to sell the annuities without disclosing that the tax shelter was of no value to them. Cooper, Ferguson, and Miller contend that higher fees, and surrender penalties,[6] add up to substantial profits, in excess of what can be gained by selling mutual funds. This added layer of "mortality and

---

[6] Surrender penalties are paid by the customer during the first seven years of the contract, if she wants to take money out of the annuity, on any withdrawals (other than any earnings, and ten percent of the premium payments, which may be withdrawn annually free of charge). The first three years the contract is in force, the surrender penalty is seven percent of the account's value. The fourth year, the surrender penalty decreases to six percent, decreasing in the final three years to five percent, three percent, and one percent, respectively. Pacific Life's Sales Guide 8-9, Pacific Life's Sales Literature App., Tab 1.

AO 72A
(Rev 8/82)

expense fees,"[7] plus administrative fees, is assessed at 1.4%

of the account's value on an annual basis.[8] Bakos Decl. ¶ 16.

> Over 10 years, for example, a retirement-plan
> investor with $100,000 in an annuity with typical
> fees would earn $8,950 less than if his money was in
> the average stock mutual fund, assuming a 10% annual
> investment gain, according to Morningstar, Inc., a
> fund-research firm.

Lohse & O'Brian, _supra_, at C1, Pacific Life's Statute of

Limitations App. (Part 2 of 2), Tab 67. Over the course of

several years, the extra fees could reach tens of thousands of

dollars for individual class members.

Nelson and Cooper filed this action in August 2003, and

filed an amended complaint in February 2004. In July 2004, the

Court denied Pacific Life's motion to dismiss as to Plaintiffs'

claims under § 10(b), and Rule 10b-5, promulgated thereunder,

---

[7]
    The mortality and expense annual fees are in addition to fund
management fees. Fund management fees are also incurred with mutual fund
investments. In actively managed mutual funds, fund management fees
compensate the professional investment analysts and fund managers for
researching companies, researching market, monetary, regional, or country-
specific risks, and for other analyses that professionals utilize to
select stocks and other investments. Fund management fees vary widely,
but, according to Pacific Life's expert, Brigham Young University
Associate Professor of Finance, Craig Merrill, the fees are somewhat less
at Pacific Life than those that are charged on comparable mutual funds.
_See_ note 14, _infra_. _See also_ Jolley Dep. 26-30, Unsealed App. in Further
Supp of Pls ' Mot. for Class Certification, Tab 9 (describing fees).

[8]
    This is also expressed in the industry as 140 basis points, where 1
basis point equals .01%.

8

and § 29(b) of the Exchange Act.[9]  In March 2005, the Court heard oral argument from the parties on Plaintiffs' motion for class certification.

## DISCUSSION

### I.  Theories of Liability in the Case

It is necessary to analyze Plaintiffs' theories of liability before reaching the class certification issues, as some of these matters were not developed fully by Plaintiffs, or treated by the Court, at the motion to dismiss stage of the proceedings.  A full understanding of these matters will also serve to clarify the propriety of class treatment of Plaintiffs' claims.

The 1933 and 1934 Acts "embrace a fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus achieve a high standard of business ethics in the securities industry."  Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972).  "[W]e read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities

_____

[9]

On October 8, 2004, Nelson withdrew as a named Plaintiff due to failing health

AO 72A
(Rev 8/82)

whether conducted in the organized markets or face to face."
Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404
U.S. 6, 12 (1971).

While the Court must look to the statute itself to
determine the scope of conduct prohibited under § 10(b), the
law "must be read flexibly, not technically and restrictively."
Id. at 12-13; Cent. Bank of Denver, N.A. v. First Interstate
Bank of Denver, N.A., 511 U.S. 164, 173-75 (1994).  Any
plaintiff who suffers an injury caused by deceptive practices
in the sale of securities states a claim entitling him to
relief.  Dura Pharm., Inc. v. Broudo, No. 03-932, 2005 WL
885109, at *4-*7 (U.S. Apr. 19, 2005).

A variable annuity is a "security" within the meaning of
the federal securities law. SEC v. Variable Annuity Life Ins.
Co. of Am., 359 U.S. 65, 67-73 (1959); Lander v. Hartford Life
& Annuity Ins. Co., 251 F.3d 101, 109 (2d Cir. 2001).

The tax disclosure and suitability determination issues
overlap in the case sub judice.  The disclosure that Plaintiffs
claim Defendants should have made in the prospectus, regarding
the redundancy of the tax shelter aspect of the variable
annuity, encompasses the idea that the product would not be
suitable for widespread use within qualified plans.  Also,

AO 72A
(Rev 8/82)

Plaintiffs argue that the omission in the prospectus decreased the likelihood that they, or the registered representatives, would be able to determine that the product was unsuitable for placement within their qualified plans.

On the other hand, the tax disclosure and suitability determinations are distinct theories on which Plaintiffs attempt to hold Pacific Life liable. Defendants could not make individual suitability determinations for customers in the prospectus, which is the source of liability asserted for the failure to disclose the redundancy of the tax shelter aspect of the product. It suffices to say that the Court will treat the tax disclosure and the suitability determination aspects of the case separately, to the extent practicable.

## A.   Failure to Disclose the Redundancy of Tax-Deferral

Cooper, Ferguson, and Miller complain that Pacific Life failed to disclose that the tax-deferred status of variable annuities was unnecessary when used within class members' qualified plans. This omission could constitute a violation of Rule 10b-5. See July 12, 2004 Order 11-13, Doc. No. 31.

Where a misleading statement is made in connection with a securities transaction, there is no requirement of showing a

11

specific, fiduciary, duty to disclose. In the sale of its hybrid insurance-security products, Pacific Life must refrain from making any materially misleading statements, in its prospectus, or otherwise. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 861 (2d Cir. 1968)(en banc); Heit v. Weitzen, 402 F.2d 909, 913 (2d Cir. 1968).[10]

In Heit, the Second Circuit considered a group of consolidated cases. In reversing the district courts' dismissal of the complaints, the court of appeals found that the purchasers of Belock Instrument Corporation's stock and debenture bonds, who had invested in the company in reliance on misleading financial statements, stated a claim for relief under Rule 10b-5. Belock's financial statements were misleading because the statements failed to disclose that the company derived significant income from overcharging on government contracts. Id. at 911. The district courts dismissed the complaints for two reasons: First, it was

---

[10]

To that extent, the Court's citation to Chiarella v. United States, 445 U S. 222, 2304-35 (1980), and Basic Inc v. Levinson, 485 U S. 224, 239 n.17 (1988), in the Order denying the motion to dismiss, was inapposite, as those cases involved insider trading and public statements concerning a merger, not allegations of material omissions in a prospectus. Kennedy v Tallant, 710 F.2d 711 (11th Cir. 1983); Rose v. Arkansas Valley Env't & Util. Auth , 562 F Supp. 1180, 1206-08 (W.D Mo 1983).

12

thought that the fraud did not occur "in connection with"[11] the

purchase or sale of any security because the courts considered

the company's fraud to be directed against the government, not

Belock's own investors. Second, because the company itself did

not buy or sell its securities, one of the district courts had

found that there could be no liability under Rule 10b-5. <u>Heit</u>,

402 F.2d at 913.

> The Second Circuit rejected these arguments, explaining:

> [T]he Court in <u>Texas Gulf Sulphur</u> construed the "in
> connection with" requirement broadly and held that
> the clause was satisfied whenever a device was
> employed "of a sort that would cause reasonable
> investors to rely thereon, and, in connection
> therewith, so relying, cause them to purchase or sell
> a corporation's securities[.]" There is no necessity
> for contemporaneous trading in securities by insiders
> or by the corporation itself. "Rule 10b-5 is
> violated whenever assertions are made . . . in a
> manner reasonably calculated to influence the
> investing public . . . if such assertions are false
> or misleading or are so incomplete as to mislead
> irrespective of whether the issuance of the release
> was motivated by corporate officials for ulterior
> purposes."

<u>Id</u>. (quoting <u>Texas Gulf Sulphur Co.</u>, 401 F.2d at 860, 861).

> While the language prohibiting fraud "in connection with"

the sale of a security may not be read so broadly as to make

---

[11]

    Rule 10b-5 makes it unlawful for a person, "in connection with" the
sale of a security, to "omit to state a material fact necessary to make
the statements made, in light of the circumstances . . . ., not
misleading[.]" 17 C.F.R. § 240.10b-5(b) (2004).

every common law fraud action a violation of § 10(b), <u>SEC v.</u> <u>Zandford</u>, 535 U.S. 813, 820 (2002), the misrepresentation need not concern the <u>value</u> of the "security in order to run afoul of the Act," <u>id</u>. <u>See generally</u>, Lewis D. Lowenfels & Alan R. Bromberg, <u>Rule 10b-5's "In Connection With": A Nexus for Securities Fraud</u>, 57 Bus. Law. 1 (2001).

In the instant case, the alleged omission regarding the usefulness of the tax shelter aspect of the product within a qualified plan clearly concerns the value of the security, and the statements were made "in connection with" the sale of the variable annuity. Consequently, Defendants may be liable for the failure to make an adequate tax shelter disclosure within the prospectus.

## B.   Omissions Related to Suitability Determinations

A failure to make a suitability determination can constitute securities fraud under § 10(b). <u>See</u>, <u>e.g.</u>, <u>Clark</u> <u>v. John Lamula Investors, Inc.</u>, 583 F.2d 594, 599-600 (2d Cir.1978); <u>O'Connor v. R.F. Lafferty & Co., Inc.</u>, 965 F.2d 893, 896-97 (10th Cir. 1992)(discussing suitability violations in broker-investor context); <u>see generally</u>, Lewis D. Lowenfels & Alan R. Bromberg, <u>Suitability in Securities Transactions</u>, 54

14

Bus. Law. 1557 (1999). While liability for suitability violations, in the past, has been imposed on broker-dealers, premised on the so-called "shingle theory,"[12] those decisions are instructive in determining the propriety of imposing a similar duty on the part of the issuer in the context of variable annuity sales.

The first aspect of Plaintiffs' suitability theory of liability concerns the lack of "suitability reviews" by Pacific Life. One of the last steps in the sale of a variable annuity into a qualified plan is the annuity issuer's review and approval of the customer's application. Plaintiffs contend, and Pacific Life does not deny, that the insurer is wholly responsible for selecting the information it requires to be submitted to issue an annuity contract. Cooper, Ferguson, and Miller assert that this gives Pacific Life the means to ensure suitable sales. Plaintiffs assert that at the final review stage, Pacific Life failed to stop or question improper or doubtful sales to guarantee informed choice by investors.

---

12

The shingle theory is "[t]he notion that a broker-dealer must be held to a high standard of conduct because by engaging in the securities business ('hanging out a shingle'), the broker-dealer implicitly represents to the world that the conduct of all its employees will be fair and meet professional norms." Black's Law Dictionary 1410-11 (8th ed. 2004)

15

The second part of Plaintiffs' suitability claim concerns a lack of "suitability oversight." Plaintiffs maintain that Pacific Life made no effort to supervise its agents to ensure that its products were sold in a suitable manner, other than to assert in selling agreements, into which Pacific Life enters with its agents, that the agents must conduct suitability determinations. See Selling Agreement 2-4, Griggs Aff., Ex. A. Cooper, Ferguson, and Miller contend that Pacific Life's contractual requirement that suitability determinations be made by the broker-dealer is an implicit recognition that the issuer is ultimately responsible for verifying suitable sales.

Plaintiffs posit that the deposition testimony of Adrian Griggs, Pacific Life's Vice President of Finance and Compliance, Annuities and Mutual Funds Division, underscores Defendants' lack of internal procedures to determine whether suitability determinations were made by their selling agents. Griggs testified that Pacific Life did not review or audit broker-dealers' compliance procedures to verify that the suitability determinations were made, explaining that Pacific Life relied on its agents and customers to make these decisions. Griggs Dep. 14-16, 22, Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 7.

In contrast with Griggs' expectations of Pacific Life's agents, Plaintiffs offered evidence that broker-dealers expect such oversight. Vincent Micciche is the CEO and Chief Compliance Officer of Lifemark Securities Corp., a company registered with the SEC and the NASD as a securities broker-dealer. Micciche filed a declaration on behalf of Plaintiffs' certification motion, in which he explained that broker-dealers rely on insurance companies to train agents on the complex sales conduct issues that are unique to variable annuities.

To contrast the variable annuity to the more familiar mutual fund, Plaintiffs contend that Pacific Life should have offered its selling agents actuarial data regarding the value of the death benefit. If registered representatives understood that this feature was worth 5.8 basis points, but that Pacific Life was being paid 140 basis points for this feature, Plaintiffs argue that it is logical to assume that selling agents would be unwilling to suggest to the vast majority of clients that they consider placing a variable annuity inside a qualified plan.

"'There's a heavy burden that has to be overcome to justify that product in a tax-deferred plan,' says Paul Roye, director of the SEC's investment management division." Lohse

AO 72A
(Rev 8/82)

& O'Brian, supra, at C15, Pacific Life's Statute of Limitations App. (Part 2 of 2), Tab 67.

Cooper, Ferguson, and Miller have submitted evidence showing that about half of the variable annuities sold by Pacific Life during the class period were placed in qualified plans. Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 1. According to Plaintiffs, this fact should have raised red flags at Pacific Life about rampant, widespread suitability violations in the sale of its variable annuity products, and should have triggered increased oversight by the issuer to ensure that investors were not defrauded into buying the annuities. Micciche Decl. ¶¶ 21, 30.

Cooper, Ferguson, and Miller also allege that there was a considerable undertaking by the insurer to get investors that were rolling over retirement funds into an IRA to purchase a Pacific Life variable annuity, without disclosing that the tax-deferral feature of the product was superfluous. Am. Compl. ¶¶ 29-50. Plaintiffs have submitted documentary evidence that supports these allegations. In an internal memorandum written by Pacific Life Assistant Vice President of Advanced Marketing, Reed Lloyd, he states that it "should be no surprise" that Pacific Life sold so many variable annuities into rollover IRAs

because that is where the company had focused its marketing efforts. Sealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 1. Likewise, an internal marketing document suggests that the company sought out qualified plan investors through a "Total Solution" marketing campaign. Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 2.

Another document that may support Plaintiffs' contention that Pacific Life endorsed variable annuities as generally suitable for use within qualified plans is a PowerPoint presentation by Gregor Darm entitled "Overcoming Objections." Darm, Pacific Life's Internal Wholesaler Training Supervisor, was responsible for training Pacific Life employees on how to get registered representatives to recommend variable annuities to their customers.

One slide in the "Overcoming Objections" presentation was entitled "VA in a Qualified Plan." This title was followed by a bullet point accompanied by the statement: "Double Tax-deferral...So what?" Darm Aff., Pacific Life's Aff. and Dep. App., Tab 3A. The slide goes on to describe what Darm contends to be the product's redeeming features, which make it suitable for use in a qualified plan.

19

Based on these documents, it appears that this may not have been a case of ignorance at the issuer's headquarters regarding registered representatives' improper sales practices. Instead, the evidence permits an inference that there was a willful orchestration of the alleged suitability violations by Pacific Life.

The evidence presented shows that the agents and principal reaped sizable profits from selling variable annuities, when compared with mutual funds. If market participants exploit the complicated nature of a financial product, which they themselves designed, at the hands of ordinary investors, the anti-fraud provisions of the federal securities law serve as a significant check to ensure that sales resulting from unscrupulous, fraudulent suitability practices are not made with impunity.[13]

Pacific Life maintains that variable annuities may be suitable for use within qualified plans in certain instances, and that it should not be responsible for determining when those instances occur. The insurer states that the death benefit protects against stock market loss, and from 2000

---

[13] "Inexplicably, the percentage of annuities being sold into qualified plans has actually increased since 1998." Michael J. Borden, PSLRA, SLUSA, and Variable Annuities   Overlooked Side Effects of a Potent Legislative Medicine, 55 Mercer L. Rev. 681, 735 (2004).

through 2002 (part of the class period, and a time in which technology stocks, in particular, lost significant value), the insurer paid an average death benefit of $12,750 per claim. Jolley Aff. ¶ 8, Pacific Life's Aff. & Dep. App., Tab 2.

Defendants' expert, Merrill, opined that low fund management fees and the death benefit feature could make the variable annuity attractive to qualified plan investors. Merrill found that the death benefit had an average expected value of $1,418, per $100,000 invested, during the class period. Merrill Report, Pacific Life's Aff. & Dep. App., Tab 1D.

Although Merrill did not convert the $1,418 figure to an "annual basis points" figure, Plaintiffs' expert has done so. According to Tom Bakos, principal of an actuarial consulting firm, Merrill's calculation comes out to 5.8 basis points annually. Bakos Decl. ¶ 9. Defendants have not challenged this characterization of Merrill's actuarial analysis. Similarly, prior to this litigation, Pacific Life's actuaries estimated the death benefit feature at 13 basis points per annum.

Plaintiffs contend that an expected value of 5.8 basis points is a poor return in exchange for the 140 basis point fee

AO 72A
(Rev 8/82)

paid by class members. Cooper, Ferguson, and Miller assert that, generally, informed investors would not use a variable annuity to fund a qualified plan if they understood these costs and benefits. Plaintiffs claim that they were prevented from obtaining a complete understanding of the product because of the complexity of the annuity, which was exacerbated by the failure to disclose the redundancy of the tax shelter in the prospectus.

Cooper, Ferguson, and Miller maintain that the annuity's other distinguishing features (lower fund management fees and annuitization) do not change the analysis. As for the lower fund management fees, Plaintiffs do not contest that Pacific Life's fund management fees, when compared to mutual funds, are marginally lower than the industry norm.[14] However, they state that Merrill's supposition that qualified plan investors would be attracted to the annuity for this reason is misleading because he ignores the mortality and expense fees that variable annuity customers must pay, but mutual fund investors avoid. Bakos Decl. ¶ 13. Plaintiffs also emphasize that Pacific Life

---

[14] The fee is .79% at Pacific Life, compared to a mutual fund industry average at 1.37%, for actively managed funds. Merrill Report 5, Pacific Life's Aff. & Dep App., Tab 1.

AO 72A
(Rev 8/82)

does not assign any economic value to the annuitization feature of the variable annuity.

Moreover, Cooper, Ferguson, and Miller assert that Merrill's study shows only that because the people who buy and sell the annuities (individual customers and registered representatives) cannot afford to commission an actuarial study to determine the value of the death benefit, Pacific Life has superior knowledge.[15] Plaintiffs maintain that despite the issuer's unique understanding of the relatively scant value of the death benefit feature, it knowingly chose to target IRA rollover investors.

Plaintiffs assert that financial experts will testify on their behalf at trial that variable annuities exist in the marketplace because of the annuities' tax shelter status, and that, in general, it injures investors to use these investment products in conjunction with qualified plans. See Moshe Milevesky & Steven E. Posner, The Titanic Option: Valuation of

---

[15]

Hanlon's deposition testimony provides some support for Plaintiffs' argument. Hanlon stated that she believed that the death benefit was worth 140 basis points annually, consistent with the mortality and expense fee, and administrative fee, line item charges. Hanlon Dep. 124, Pacific Life's Aff. & Dep. App., Tab 9. Further, Hanlon opined that if the mortality and expense fees were imposed for the tax advantages associated with the product, then that information might be relevant to determining whether the contract was appropriate for placement within tax-deferred retirement plans. Hanlon Dep. 33.

23

the Guaranteed Minimum Death Benefit in Variable Annuities and Mutual Funds, 68 J. Risk & Ins. 91-126 (2001), Unsealed App. in Further Supp. of Pls.' Mot. for Class Certification, Tab 13

Cooper, Ferguson, and Miller have produced evidence that could establish that Pacific Life made no efforts to ensure that suitability determinations were made, but instead attempted to cast off all responsibility onto its agents, the broker-dealers and the registered representatives.

In the Court's judgment, a variable annuity issuer's failure to undertake suitability reviews, or engage in suitability oversight, could constitute securities fraud. Whether liability should be imposed on Pacific Life under the facts of the instant case is a matter for the jury to determine. While perhaps not going directly to the value of the security itself, the insurer's failure to ensure suitability determinations could constitute a fraudulent omission "in connection with" the sale of a security, within the meaning of the securities law. Zandford, 535 U.S. at 820.

The Court recognizes that the responsibility for determining suitability at the point of sale is typically the domain of the broker-dealer. However, the variable annuity is a complex financial product, much different than a typical

24

stock or bond. Plaintiffs have presented evidence that the issuer has superior knowledge regarding the economic value of the death benefit, placing the issuer in a better position to determine suitabilıty on a customer-by-customer basis, <u>when</u> the investment is to take place inside a qualified plan.

Moreover, Plaintiffs have presented some evidence that Defendants actually increased the difficulty of the suitability determination by issuing a misleading prospectus. Plaintiffs aver, with some evidentiary support, that registered representatives rely on Pacific Life to explain the appropriateness of this product within qualified plans. The Court cannot say the issuer has no responsibility for the suitability determinations as a matter of law.

In sum, Defendants may be liable under Rule 10b-5 for suitability omissions. The Court emphasizes that this holding is a narrow one, confined to the unique facts presented here. <u>See</u> NASD Notice to Members 04-45 & Insurance Marketplace Standards Association, Comment Letter on NASD Notice to Members 04-45, Micciche Decl., Exs. F & H, respectively; Jeffery S. Puretz, <u>Insurance Products as Securities</u>, 858 PLI/Comm 45, 108-116 (2004); Peter J. Anderson, <u>The SEC and NASD Have Sent a Wake Up Call to Insurance Companies Issuing Variable Products:</u>

AO 72A
(Rev 8/82)